Good morning. Please be seated. As the litigants know, both Judges Thompson and Stahl, who will not be asking questions this morning, will nevertheless participate in the deliberations and decision in this case, as they have up to this point. Chief Judge Howard, the case today is No. 161492, Mark W. Eves v. Paul R. LePage. May it please the Court, and good morning. My name is David Webert. I'm here with my co-counsel, Carol Garvin. And with the permission of the Court, I'd like to reserve four minutes for rebuttal. Yes. I'd like to begin by emphasizing three sets of major concessions that I think really simplify and narrow the case for the en banc court. First of all, I want to emphasize our concessions about what we're not challenging and not claiming as an adverse action. We're not claiming or challenging, for example, the Governor vetoed bills. Many of the allegations in the complaint are in there solely as evidence of motive, but have nothing to do with the adverse actions that we're alleging. So in no way are we asking for relief from the Court from the Governor deciding to veto. He can veto all he wants, and the Speaker of the House was very fine with the remedies and rights he had as the Speaker of the House to deal with that issue. In fact, the legislature overrode those vetoes by a two-thirds majority. So we're not here bothering this Court with matters that can be handled very easily between the executive and legislative branches. I'm not here to challenge any criticisms or comments by the Governor. There's a marketplace, an arena of free speech, and the Speaker of the House is fully committed to robust speech on both sides, and he'll take his licks and he'll take his ability to counter those in the court of public opinion. So when the Governor wrote a detailed letter on June 8th making harsh criticisms of the Speaker of the House, we have no complaint about that as an adverse action. When the Governor said that Mark Ease beat his wife or that he was corrupt as sin, we're not here about that at all. We will deal with that in the public marketplace of ideas. Those are not before you, and even the termination is not an adverse action that we're challenging. The Governor did not terminate Mark Ease. So that's not one of the adverse actions. There are only two adverse actions, and they're both things the Governor did, not a third party. He pulled back. He rescinded. He put a stop order. He canceled $132,000. And the second thing he did was he very clearly, and it's very clear in the complaint, I think he even admits to it, threatened to withhold the rest of the over $1 million for a 100-year-old charitable, nonprofit, nonpartisan charity committed to helping at-risk children and youths have become good citizens. Those are the only two adverse actions. My second set of concessions relates to state of mind. I admit, and if I lose because of this, so be it, that there are possible legitimate motives for the Governor withholding funding. For example, he alleges corruption, financial corruption, lack of qualification. Perhaps being a wife-beater itself probably should be disqualifying in some, give concern at least. So there are legitimate reasons. But the case law of this Court and the U.S. Supreme Court is very clear. That would destroy every race retaliation claim and every First Amendment retaliation claim if the mere possibility of a objectively plausible and legitimate non-discriminatory motive would win the day, and certainly not on a motion to dismiss. This Court has held to the contrary. Judge Bodine worded it very eloquently and concisely. This Court has reiterated that several times, that on a motion to dismiss, and we're only on a motion to dismiss. I'm not asking to win anything today. But that the motive is the one alleged by the plaintiff, as long as it meets, it's not a too thin of a case, too thin of a case, and those should get thrown out, and this Court has said that, and that's my third set of concessions is that we're not alleging that we're 100 percent clear that a jury is going to rule in our favor. The jury has to decide that, and there's all kinds of procedures to go down the road. This is a motion to dismiss. And so I'm not claiming that you should decide that the improper motive of political affiliation, retaliation, was the motive, or even the most likely motive. All you have to decide today is that it's a plausible motive, which is much less than likely. It's just plausible. And I – your circuit, I went and looked at Shepard's. You have the honor of having the most circuit court opinions applying Bronte. You're number one. You have a close – somebody's a close second, I think, to Seventh Circuit. But you're number one. And your opinions, when you look at them, many of them find circumstantial evidence is enough, especially at this stage of the case, when you have a hypercharged political environment and you have one political opponent taking adverse action against the other, and then the facts get sorted out later. This case, we have direct evidence of a very hypercharged. I think in the history of Maine, I'm not aware of a Governor making the kind of statements I would veto every bill by a Democrat. Once again, I'm not complaining about that as an adverse action, but it's evidence of political affiliation, discrimination, motive. It's solely in the case as motive. So the Governor can say those things all he wants, but it's relevant to his motive when he took the $132,000 back and when he threatened to withhold the rest, which are the only two adverse actions I'm challenging. Can I ask you, you said that the $132,000 was going to be taken from GWH. I just want to understand exactly how this works. Because I understand that the Governor's authority to spend money that is allocated to DOE for miscellaneous educational services gives him authority to spend money on the Center for Excellence. Now, the way I understand it, and you tell me if I'm wrong, GWH then chose to implement the provision that says there will be a Center for Excellence by creating a charter school means. Is that right? The statute actually identifies Goodwill-Hinckley as the only entity that's going to be the Center for Excellence. It actually calls it out and says, you're going to be the one. So the statute actually kind of – Well, but I'm trying to understand, is there a – two things. GWH does things apart from the Center for Excellence, correct? A whole lot of things. Yes. Okay. So that's point one. Point two, does the Center for Excellence do anything apart from means? I don't think so. I'm not aware of it. Okay. So what I – what my question then is, when he pulls back that $132,000 from GWH, he's – under the statute, what he's pulling back is money that he's authorized to spend on the Center for Excellence, which is means. No, because – So why is that wrong? Because it's actually Goodwill-Hinckley in the statute. It actually is the entity that receives the funds, and it's not required to spend – But you just said GWH is distinct from the Center for Excellence because it does things that are not the Center for Excellence. In other words – But the money goes to the – Well, I know it goes to GWH, but it's appropriated or authorized to be spent only for the Center for Excellence. I don't believe that's correct. The complaint alleges to the contrary, and so does the independent – The statute – does the statute give him any authority to spend money on GWH apart from spending it for the Center for Excellence? Discretionary funding – Yeah. Is – he can give it to Goodwill-Hinckley or not. It doesn't say that it has to go to means. No, I – And that's in the complaint. And that's in the – Well, the statute references the Center for Excellence. It does not authorize spending for GWH apart from the Center for Excellence. Is that right? It actually identifies Goodwill-Hinckley as the recipient of the funds. Right. Insofar – Insofar as it's implementing the Center for Excellence. Isn't that right? It doesn't say that in the budget that appropriated the extra dollars that we're talking about. I understand. The statute that authorizes him to spend the money in the budget. That's what I'm asking about. Well, there's two sets of money. And the original funding – has a – sort of a formula that also goes to other schools. This is on top of that. And this is in a different provision in the budget. It didn't have to be there. It didn't – it wasn't necessary. It was something that they kept adding because they thought that the school needed more time to stand on its own two feet. As far as I understand – It's chapter 227. I don't think that's the discretionary funding we're talking about here. Correct. That's the original – that's the core money that keeps coming every year. The governor had no discretion over that. It was the extra money. And I understand that was for Goodwill-Hinckley in the budget. Maybe that's a different way. If chapter 227 did not exist, would the governor be able to spend this money by giving it to Goodwill-Hinckley? I think the legislature would be authorized to say you can spend money on this school. Yes. In the budget, regardless of the fact that it also – I mean, there's a connection, but I don't think they're dependent on each other. No. It's a separate set of money. GWH runs a museum, right? Runs – yes. A bunch of things. Could the governor spend the state funds that were appropriated to DOE on the museum? Yes, in the sense of he could give the money to Goodwill-Hinckley or not. And then it was up to Goodwill-Hinckley. And the investigation that was nonpartisan that we have the report in the record found that Goodwill-Hinckley did not spend that money on the Charter School directly. It spent it on its own overhead, its own operating cost, so that it did not just – it didn't go to the Charter School. It actually found that explicitly as a finding. So on a motion to dismiss, it's in the complaint and it's supported by an independent, bipartisan, nonpartisan part of the legislature that investigated this and found those facts. So at this stage of the case, of course the governor can push on that and argue that and maybe win on summary judgment. But at this stage of the case, the money was going to Goodwill-Hinckley and it did not go –   And that's what the findings of the investigative report. Okay. Related question. Could you just explain to me the relationship between GWH and MEANS? Sure. Well, the complaint says – They say that there's a statute that makes GWH the authorizing or the authorizer for MEANS. Is that right? Yes. Okay. So what does it mean to – that's just a statute. So presumably GWH is the authorizer for MEANS. Correct? Yes. So what does it mean to be the authorizer? What obligations do you have as the authorizer under MEANS law? Well, I guess the flip side of that is there's an independent – it actually had to be separate from the Charter School. So it required that the Charter School have a separate board of directors. It has a separate principal. So the law and the facts in the complaint make it clear that there is separation between Goodwill-Hinckley I totally understand that. And the Charter School – There's not perfect separation. That's all I'm saying. No, it oversees it. So what does that mean? That's what I'm – what do you – do we have anything in the record that tells us what it means? After you've authorized it, presumably they establish a contract. GWH has a contract with MEANS, right? Well, there's a Charter School where you sort of agree to certain requirements to get the funding. And I believe that's really with the State more than with Goodwill-Hinckley. Does MEANS and GWH have a contract? Does GWH, as the authorizer of MEANS, have a contract with MEANS? That's not in the record that I'm aware of. What's in the record is it has its own principal, its own board of directors, and the independent report said it's controlled by the Charter School. Goodwill-Hinckley oversees a bunch of other programs. This is just one of those. It's been around for over 100 years, so it's definitely not the Charter School here. It's got integrity and independence that completely transcend the Charter School, which is the reason why, if I can just make this final point, that no reasonable official could think that the president of a hundred-year-old nonprofit charity is subject to a political loyalty requirement. And that's the only exception that Bronte recognizes and this Court has recognized. And it's always for a public office or official. That's in every quote from Bronte. This Court, only one time did this Court ever even talk about it being a private entity, and that's the Prismazona case, which is completely distinguishable because that entity ---- That's all in your briefing. Thank you. Thank you, Mr. Auberage. May it please the Court. This case raises a number of different constitutional issues, any one of which is sufficient to dispose of this case at the motion-to-dismiss stage. But the Court need not actually reach any of the three independent bases for dismissing the claim, those being the fact that the retaliatory acts are government speech, that the allocation of the funding falls within the policymaker exception where partisan or ideological considerations may influence the government's actions, and absolute immunity. And the reason we need not reach into those questions is because qualified immunity is an easy decision in this case. The Supreme Court authorizes the Court to skip directly to the question of qualified immunity as to whether any clearly established law prohibited the acts that are complained of. Before I get into that argument, I do want to address the point that Judge Barron was pursuing with my friend on the other side. At page 64 of the appendix, which is our initial brief down below, it lays out the statutory history. But there is no dispute in this case that the money, the discretionary funding at issue was for the Center of Excellence. And there is no dispute that the Center of Excellence is, in fact, medians. And you can see it in the complaint itself. It's paragraph 78 of the complaint makes it clear that the discretionary funding that is at issue in this case was allocated to Hinckley for its work operating the Center of Excellence for at-risk students. That is the state of the law. It is not a disputed issue of fact. And this attempt to kind of build a wall between meands and Goodwill-Hinckley I think is really just kind of a last-ditch effort to save a complaint that cannot state a claim for relief. And to emphasize that point, and we make this point in our policymaker's section, the job description that is referred to in the complaint and that was publicly released talked about the fact that the person who they were seeking would be the leader of both GWH and meands. The announcement of Speaker Eves as having received the job, which is also referenced in the complaint, says that he is leading GWH. Well, could you answer the same question I was asking your opponent, which is what is the relationship between GWH and meands? Because meands does have a separate board. It has a separate principal. GWH, as I understand it, is the authorizer of meands. And does the record show whether there's a contract between meands and GWH? I don't know if the record – I mean, the OPEGA report, which he attached to one of his pleadings below, has in-depth discussion of the analysis. I don't know. I can't tell you specifically whether there's a contract. If there's a contract, the contract is not in the record. The contract is not in the record. But what is in the record, plainly, is that the position was advertised as being both the leader of both schools. There is overlap among the boards. These are all private employments, aren't they? They are 501c3s, but the money that is issued in this case is public. Are they public or private employment? They are 501c3s. They are not themselves public, but they are receiving public money to operate a public charter school. Does that make them a public employee? It means that when determining whether or not the acts with respect to the particular public funding that was at issue here to accomplish a public activity, which was public education through a public charter school, makes it public for purposes. And Northlake, for example, makes it clear that private contractors can perform public functions and the policymaking and government speech exceptions can apply to those private contractors. Just so I get the limits of your argument, so many private universities operate charter schools. Many private universities operate charter schools. Okay. Is your position then that the governor of a state could make a condition of the university that in order to get funding for the charter school, it has to have a Republican or a Democrat as the president? Our position is that the government, when it is providing, well, in this case, future discretionary funding, is free to make decisions about how it employs that future discretionary funding. Is the answer to that yes or no? Well, I guess your assumption is that the private university is receiving public money to operate the public charter school. If the answer to that is yes, then the government, regardless of party, is free to make decisions based on public policy concerns regarding the implementation of charter school policy. We don't need to know any more about the relationship between the university president and the operation of that charter school? Well, you may need to know in some cases. If there was true independence, that would be fine. But in this case, on the facts of the complaint, we have the clear relationship. What's true independence in your view? If there was no overlap between the boards, if the leader of the chancellor of the university, I mean, I'm not really sure how to apply the hypothetical. Well, isn't the burden on you to show it's a policymaker? No.  It is on me to show that it's a policymaker. So unless you can meet that burden, you can't say it's a policymaker. Well, no, that's not true. Unless we can, the question in this case is whether it was clearly established by law. That's the qualified immunity. And I understand that point. Right. If we chose to also decide for purposes of clarifying the law, the question of whether there was a violation, the burden would be on you, right? The burden would be on us initially to show that, yes, it is in fact a policymaker. So how do you meet that burden here? In this case, we meet the burden from the facts in the complaint that I just referenced that make it clear that this position was advertised as being the leader of GWH and MEANS, of the search committees, MEANS board's extensive participation in the search committee process, with the fact that the announcement was that the speaker would be the leader of both MEANS and Goodwill-Hinckley, as well as the overlapping statutory requirements, and the fact that this specific funding, and, again, I think when you're assessing the claimed act of retaliation, you've got to look at what the nature of the retaliation in this case. In this case, it's withholding unappropriated future funds that are specific and discretionary to the governor for the operation of the charter school. It should be noted that MEANS receives more than a million dollars of other state public education funding that is not discretionary, that is not specific to the Center of Excellence, and there's no allegation that there was any threat or there were any actions taken with respect to that funding. The funding in this case is only for the discretionary point. That leads me to a second point that I really must make. Before you go into that, can you just tell me what in the complaint gives you support for making this a policy, a public official that has to live up to policy, or establishes policy, I should say? We think that the allegations in the complaint that establish that this position is policymaker is off. Can you tell me specifically what part of the complaint? Yeah. There's – I can give you citations if Your Honor would like. The job advertisement, which is cited in paragraph 17. Job advertisement. What does it say? It says that the President will lead both Goodwill, Hinkley, and the Maine Academy of Natural Sciences in a leadership role as one of the factors to determining whether someone is a policymaker. Well, but does it have to be policymaker, effective performance of the public office involved? Why is this a public office? The public office in this case is the operation of the charter school, which he does not – there is no dispute that Goodwill, Hinkley operates MEANS, the charter school. In fact, my friend on the other side has said that in writing to courts twice in this case. They said it below. You'll see it at page 100 of the appendix. And he said on page 17 of his opening brief to this court, GWH operates MEANS, and that is the public office that we're talking about in this case. I'm sorry. I'm new to this case, so you're going to have to help me a little more. No problem. What is the public office? I don't understand that. The public office in this case is the operation of the public charter school. That is the public role that in this case the 501c3 is being asked to undertake. That is a governmental role operating a public school. And so the office in this case is who is in charge of managing, leading the operation of the school. Just so we clear, seven backers, if we didn't have GWH in the mix, your position is that the principal of a charter school can be made to be of a particular party? Our position is that it's the kind of criteria that illustrates the policymaker's role. Can the principal of a charter school be made to be of a political party? If it is a public charter school, then I don't know if the principal can, but certainly the superintendent of the school district is. I think in most cases the principal can be. But the superintendent of the school district, that's not what we have here. I think it's actually more akin to that, because Goodwill-Hinckley, as you pointed out, operates in a number of different functions. One of them is implementing the primary. One is implementing the center of it. The other ones aren't public functions at all. Setting that aside, in this case the only public one is the superintendent of a school district. But we never held, or I don't know of any case that says the principal of a school can be selected on a partisan basis. We cited several cases in our brief, including O'Connor. O'Connor v. Steeves talks about the provision of services at public schools. It's not specific to a principal. Is your proposition that the head of a charter school can be the funding for the charter school can be conditioned on whether it's Republican or Democrat? I think, well, yes, although this Court has been clear that when it talks about the policymaker exception, the Republican-Democrat is a shorthand for important public policy goals. And the allegations of the complaint established that there was a heated debate in which both parties to this case were participants on opposite sides as to the advisability of charter schools in the State and how their mission should be accomplished. So in this case, the answer to that is yes. And this Court has been clear that the policymaker rule does not necessarily require a high office. It's anyone who's involved in communications, reaching out, otherwise representing the school. And to go back to Judge Torello's question, in addition to the job, the job announcement also talked about the duties would include the fulfillment and advancement of the mission of GWH and MEANS and its programs. It required working experience, working with the legislators and State policymakers. And then one of the qualities sought was superior communication public relations skills in representing GWH and MEANS to its public and private constituencies. Those are all the types of duties that are consistent with what this Court has said constitutes a policymaker. Scalia, that's a public office. Well, yes. But in this case, and again, Northlake is clear from the Supreme Court that private contractors who are contracted to perform public policymaking functions can be treated as such for the policymaker exception. Well, thank you. I do want to address this question about the alleged pulling back of funds. There is no dispute in the record, and the complaint concedes it, that these were discretionary funds that had yet to be appropriated. The budget-making process was still in the throes of occurring in the State of Maine at the time. The budget was later vetoed. The money in June, there was no money to either appropriate or to provide to MEANS or to Goodwill-Hinckley. That was unappropriated funds. And any rule that basically suggests that it is an act of unconstitutional retaliation to fail to take a step to provide somebody with unappropriated funds would be extremely problematic, for no other reason than the fact that that's actually illegal in Maine to provide funds that are not yet appropriated. So I don't think that can be the basis for a reasonable retaliatory act. Was that his only threat, that if they weren't, that they wouldn't be appropriated? Or was his threat that even if they were appropriated, he wouldn't spend them? Well the way the record presents itself on the 12b-6 motion. I think that would have to be a different question. The threat, the allegation in the complaint is that he pulled back payment of funds that were scheduled to go out. And he vowed not to spend any money going forward. That's an implication that the complaint is throwing upon. But certainly our view is that. But what about that one? Well, as we make clear, and I think as the courts in bonk order anticipates, governments are free to make decisions based on policy as to what they want to do with funds. Okay. But that's just, that's a different point, right? Well, that's a different point. I will say this, and our absolute immunity argument makes clear. The Supreme Court in Bogan, which was a case that came out of this Court, and I'm sure the Court is familiar with it, was quite clear that budget-making activities, no matter at what point in the process. That's yet a different point. Well, I'm sorry. I don't think, I think that's the same point. The question of whether he's trying to set the budget is one point. Right. The question of whether if he's just trying to implement the budget, an expenditure that's been, that he would have in the future, then you rely on the policymaker exception, right? That's a different point. Fair. Okay. An additional point, yes. So if it's not a policymaker, and he was not saying I'm going to adjust the budget, then what he's threatening is funds that are available to me, I will not spend. If we want to ignore the legislative calendar, and the conceited fact that no funds have been appropriated at this point, as we point out the Youngblood v. DeWeese case from the Third Circuit makes clear that when the legislature has, even after the funds are appropriated, left to the discretion of the recipient of the funds how to spend them, it still constitutes budget-making, and absolute immunity still bars claims that arise from it. And there's an enormous practical problem. Counsel, what is the actual language quoted in the complaint about what the governor said? There's a number of quotes in the complaint about what the government said. It quotes the letter that he issued. What did the letter say? The letter talked a lot about the speaker not being qualified for the job and having concerns about his prior opposition of charter schools. That was the gist of the letter. I thought you would help me with the actual language that was used, as opposed to a characterization of the language. The letter speaks for itself. I think our point is that the letter is an act of speech, and I understand my opponent to be specifically saying that the letter is not a basis for his claims, although it is in the complaint, and I think that he's trying to draw inferences from the letter for purposes of this case. The one point that I do want to make before my time runs out is the importance of the qualified immunity aspect. There have been no questions about that today, but I'm sure the Court understands how specific the Supreme Court is in requiring qualified immunity, and specifically suggests the Court should think hard and think twice about reaching out to decide constitutional issues when the qualified immunity answer is clear. None of the cases that Mr. Hughes has cited, the speaker has cited at any point in this case, come close to this type of particular factual specificity which is required for qualified immunity not to bar. What do you say to the Brousseau case? I'm sorry. Which case? Brousseau v. Hoagland. Is that the one from the Third Circuit after Zaloga? That's a Supreme Court case in which the Supreme Court said a violation that is, quote, so obvious that a reasonable person would have known about it is not entitled to qualified immunity. Let me just have a minute to address the question. That is the general principle, but of course that just raises the question as to what is the alleged obvious violation in this case. And as we point out, Zaloga, R.C. Maxwell, a number of other cases from other circuits, and no case from this Court comes close to suggesting that the actions here even violated the Constitution, let alone meeting the burden of clearly established law. And I will note that that's also true with respect to the policymaker function. We argued that below, and we certainly are willing to stand on that. The reason you shouldn't reach out to decide any of these questions is because if you decide one of the merits questions, you're going to have to reach all of the merits questions in this case. That's one of the reasons why in Pearson the Supreme Court said courts should skip to the second step of qualified immunity. That's what we would ask the Court to do here. Thank you. Roberts. Judge Lynch, you had a question. I just want to answer it. Paragraph 7 of the amended complaint, it's really simple. Somebody asked the Governor, did you make the threat, and he said, yeah, I did. No, no, no, no. No, no, no. Go back to what the language was that was used with the GBH principles, not the characterization later. Usually on a motion to dismiss, an admission by the defendant is enough to get you past that. So, Judge Barrett, I did go back and look at the language. Could you answer my question before you move on? I'm sorry. What was the question? There's paragraphs and paragraphs of people talking at the same time. Yes. What was the actual language that he used? Well, it was profane. There's a lot of it, but he admitted not knowing it. What was the language of the threat? Why are you avoiding this question? Oh, he admitted to it. So usually on a motion to dismiss, we don't spend a lot of time on something that we don't know. You and I may have a difference in view where qualified immunity is involved as to how you look at the complaint. But you volunteered that you were going to answer my question, and then you got up and you did not answer my question. I cited a paragraph of the complaint, and I – if the Court – that's – I'm relying on that, so I'll let the Court decide whether paragraph 7 says that or not. So I apologize if it doesn't, but that's my good faith representation of the Court. Before you move on to this, because it would be helpful to me to know, I thought there was an exchange between the governor and the funder of GWH that's alleged in the complaint. And the funder said, I came away with the distinct impression that the $1.3 million was going to be gone, and that's plenty on a motion to dismiss. I mean, we have so much of it, it's – the other side never contested that they made the threat. But what we have in the record is a representation by the funder about what the governor said to the funder? Yes. And do we have anything else in the complaint from the governor beyond the – what you said, which is that he conceded that he had made a threat? Both to the president of Goodwill-Hinckley, who came away with the exact same impression. And what's the complaint say about Goodwill-Hinckley's presidency on that? That he had got a note and had a conversation that led him to believe that the governor was threatening to withhold the $1.3 million. That's how he interpreted it. And this exact same impression was created with the benefactor who was going to give $3 million to Goodwill-Hinckley and realized that the organization was going to be losing a million. The question you asked about the contract, if you look in the appendix on page 120, Your Honor, it goes through all this and says the contract is between the main charter school commission and means, not Goodwill-Hinckley, just so to answer that, so it's not with Goodwill-Hinckley. There's no – so is GWH the authorizer under this charter? The charter statute says there's somebody who's an authorizer. Because it already existed and it was already an entity that was well respected, that's the repository where the charter school got put. But it's not – it is – the charter school is primarily run, according to page 120 of the appendix. If you look, it's by the board of directors of the charter school and its principal. So there's a major layer of independence. It's required, actually, by the provisions. And secondly, it is not a public charter school. The statutes I cited in my final brief, it is a private school. So your position is that there is no legal obligation of GWH with respect to means? Well, it's part of means. I mean, means oversees it. I don't want to overstate the separation, but here's the point. It's a private school. Just because a private school gets money doesn't make it appropriate for partisan affiliation. There's no case law that says that. I mean, that's fine. Okay. I'm just trying to understand what the legal relationship is between GWH and means. If the point you're trying to make is we can't tell yet on this record, that's fine. But you are conceding that GWH operates means. Yes? That's in your complaint. In an umbrella fashion. Yeah. But it's more directly controlled by and operated by the board of directors and the principal of the charter school. And just last question. Could you add any content since your complaint says GWH operates means? What you understand the word operate to mean. Functionally, what does that mean GWH does with respect to means? I mean, it gently oversees it, among other operations, but delegates most of the day-to-day operation and the day-to-day control to a separate board of directors and a separate principal. And also, the money went to Goodwill Hinckley. It's in the appendix, Your Honor. So it did not go to the charter school, this money we're talking about. Thank you very much. Thank you both. All rise. The discussion of the August United States Court of Appeals is not recessed until 1030 this morning. The panel of courtrooms, God save the United States of America in this honorable court.